UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSEPH D. ULRICH,

                       Petitioner,

    -vs-

JAMES BERBARY, Superintendent,
Collins Correctional Facility,

                    Respondent.
_____

**DECISION AND ORDER**
No. 03-CV-0328(VEB)

## INTRODUCTION

Petitioner Joseph D. Ulrich ("Ulrich"), represented by attorney Howard K. Broder, Esq., has brought a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 1986 conviction in Cattaraugus County Court on one count of second degree murder (N.Y. Penal Law § 125.25(1)). The parties have consented to final disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction here at issue stems from Ulrich's alleged responsibility for the murder of Jack Smith ("Smith"), the fiancé of Ulrich's former girlfriend, Pamela Fisher ("Fisher"). On the evening of June 8, 1984, Smith was shot in the back of the head with a shotgun while sitting in the living-room of the house he shared with Fisher. The murderer apparently fired the shotgun through the window screen, hitting Smith, who was seated in a chair several feet away, in the back of the head.

Because of Ulrich's previous involvement with Fisher, he became a suspect in the murder

-1-

investigation. He was arrested on June 9, 1984, waived his *Miranda* rights, and gave an exculpatory statement to the police. Several items, including a .12-gauge shotgun and a box of #6-shot shells, were seized from Ulrich's property with his consent. The New York State Police performed limited testing on the shotgun found on Ulrich's property, determining merely that it was operational. Any further ballistics testing on the shotgun, a pre-World War II, smoothbore model, was not possible because no expended shell cartridges were found at the crime scene. *E.g.*, R.991, 993-94.[1]

**The Trial**

Ulrich was tried before a jury in Cattaraugus County Court (Kelly, J.). On January 27, 1986, just prior to opening statements, defense counsel moved *in limine* to preclude the prosecutor from introducing or making any reference to the shotgun found at Ulrich's residence, arguing that there was "no forensic, scientific, nor ballistic connection between Mr. Ulrich's weapon and the weapon that was used to kill Jack Smith." R.837. The prosecution argued that the evidence would show that the murder weapon was long-barreled and fully choked (as Ulrich's shotgun was) and that this was significant because a shotgun of this type would keep the pellets in a close pattern, as they were when they struck the victim. R.842.

At the prosecutor's request, Judge Kelly granted a continuance for the prosecutor to do further research and present additional argument. During this time, the prosecutor contacted Investigator Charles Boone ("Boone") of the New York State Police to ascertain whether any testing could be done to tie the shotgun more closely to the murder, and in particular asked him

---

[1] Citations to "R.__" refer to the state court Record on Appeal, submitted to this Court as part of respondent's Exhibit B to its Answer to Ulrich's habeas Petition.

to determine at what distance did pellet-spread begin to occur. Boone fired the shotgun three times at a paper target from three different distances and measured the gun's pellet spread. On January 28, 1986, at oral argument, the prosecutor asserted that the "firing pattern on this weapon [wa]s consistent with the firing pattern that killed Jack Smith." R.870. Judge Kelly disagreed that the prosecutor had made enough of a showing to admit the shotgun into evidence, noting that it was a "real conjectural connection . . . on what we have got here." R.882. The following day, on January 29, 1986, Judge Kelly altered his initial ruling to the extent that he agreed to entertain an offer of proof, upon the prosecutor's timing, as to whether testimony about the shotgun and the shells should be introduced. Judge Kelly denied defense counsel's request to preclude the prosecutor from commenting about the shotgun and the shells during his opening statement. R.886-87.

On February 3, 1986, defense counsel again argued that any proof concerning Ulrich's shotgun should not be admissible because there was no connection between the crime and the shotgun. Judge Kelly indicated that his "understanding . . . was that the connection as to the shotgun and as to the testimony would be there would be a reasonable connection made between the events and the shotgun. All we have now is an event that shows the results of a shotgun and a defendant that owns a shotgun. I thought there was going to be more of a connection demonstrated." The prosecutor responded that Boone would testify concerning the firing pattern of defendant's shotgun and that his testimony would demonstrate that the firing pattern observed on the deceased was "consistent with this particular weapon delivering the fatal shot." Judge Kelly reiterated his original ruling concerning the admission of the actual shotgun and ammunition but allowed testimony about those items.

At the jury trial, Fisher testified that she had dated Ulrich for about nine months. After she ended the relationship in 1983, Ulrich was very unhappy about the outcome and continued to leave notes for Fisher at her residence, call her frequently, and drive by her house. R.1471-72.

In December of 1983, Fisher related that she began dating Smith; he moved in with her at the end of April or early May in 1984. Ulrich informed Fisher that he did not like Smith and did not want her living with Smith. R.1474. The trial court allowed Fisher to testify that, on one occasion, Ulrich telephoned Fisher and informed her that he had an extra tire for her car if she ever needed one; a week or two later, Fisher discovered that the tires on her car had been slashed. R.1472. Fisher recalled that a week after replacing the tires, she found that the valve stems had been tampered with. R.1473. Several days later, Fisher's car was burned. R.1474.

After the incident involving the car fire, Fisher and Smith decided that Smith would move out since both believed that his presence was precipitating these acts of vandalism. R.1476. Fisher testified that she was frightened and therefore asked Ulrich to stay with her for a few days. *Id.* According to Fisher, however, the arrangement did not work out, and she asked Ulrich to leave. Ulrich did so, and Fisher then reunited with Smith. On May 17, 1984, the two moved to 150 Chestnut Street in the Village of Gowanda. R.1476-77. Three days later, on Fisher's birthday, they became engaged. R.1477-78.

On June 4, 1984, Fisher testified that she went to Ulrich's house to retrieve some of her personal items. R.1484. At that time, Fisher told Ulrich of her engagement to Smith; Ulrich said that she was "dumb" for getting engaged to Smith and asked her to stay with him. *Id.* As she was leaving, Fisher recalled that Ulrich said that if anything happened to Smith, or between her and Smith, Ulrich would always be there for her. R.1485.

-4-

Fisher's sister, Wanda Gearman ("Gearman"), testified for the prosecution that she still spoken often with Ulrich, even after Fisher and he broke up. When Gearman saw Ulrich, he would often be on the verge of tears. R.1080. Ulrich frequently called Gearman and told her that his break-up with Fisher was "tearing him to pieces." *Id.* Ulrich expressed his dislike of Smith to Gearman on several occasions, saying that Smith was a "snake." Ulrich said that he had hated Smith since high school and that Smith would get what he deserved. R.1081. Gearman related that Ulrich repeatedly asked her for the address where Fisher and Smith were living.  In June of 1984, Gearman relented and gave Ulrich the address. R.1081-82.

Robert Ellis ("Ellis"), the president of a realty company in the village of Springville, where Ulrich resided, testified about a visit he received from Ulrich on June 7, 1984. R.1012. That day, Ulrich asked Ellis to come appraise his farm because Ulrich wanted to sell it. *Id.* According to Ellis, Ulrich said that he did not have the "heart or the will to continue farming" because he was so upset that his girlfriend had left him. R.1012. Ellis described Ulrich as "somewhat emotionally distraught" at the time. R.1013.

To rebut Ellis's testimony as to why Ulrich was interested in selling the farm, defense counsel attempted to show that Ulrich had told Ellis that he had a bad back. R.1019. Ellis testified that, at one time, Ulrich had said that he was having trouble doing the work required to keep the farm going due to his back problems. R.1020.

Betty Swanson ("Swanson"), a salesperson at Ellis's agency, testified that later during Ulrich's visit, he said to her, "[W]hat you see here is a broken man." R.1026. According to Swanson, Ulrich said that he had purchased the farm for himself and Fisher, and that he loved Fisher but she did not want anything to do with him so he was going to sell the farm and move to

Florida. R.1026-27. Swanson characterized Ulrich as "upset" at the time. R.1027.

Marsha Tierney ("Tierney"), Fisher's neighbor, testified for the prosecution that she lived at 120 Chestnut Street (Fisher and Smith lived in the first floor of a two-family duplex at 150 Chestnut Street, which was located on a corner lot. Tierney's house was the seventh house from the corner. R.1042-43.) Tierney testified that on June 7, 1984 (the night before Smith was killed), she arrived home from bingo at around 10:00 p.m. R.1043. At about 11:00 p.m., she looked out her side-door to make sure she had turned the car headlights off, and was startled to see a man walking up her driveway. R.1043-44. Tierney described the man as 5'11", huskily built, weighing about 200 pounds, wearing a dark-colored coveralls, and carrying what appeared to be a motorcycle helmet. *Id*. Tierney thought that the man had brown hair and might have had a moustache. R.1045.

After being seen by Tierney, the man turned around and walked out of the driveway, went up Chestnut Street in the direction of Fisher's residence, and then went down two houses and disappeared between the houses. R.1045-46. Tierney noticed a red or orange motorcycle parked in the street. R.1046. About thirty minutes later, Tierney heard the motorcycle start up and saw it go up to Jamestown Street,[2] make a U-turn and head back down Chestnut Street. R.1047-48. Tierney testified that she believed that the motorcycle had an electric starter.

Fisher also had gone to bingo on the evening of June 7th while Smith remained at home to baby-sit Jeremy, her son from a previous marriage, and Charlie, Smith's nephew. T.708. Fisher returned home at about ten minutes to eleven o'clock, and she and Smith watched the news on television before going to bed. *Id*.

---

[2]     Fisher's house at 150 Chestnut Street was on the corner of Chestnut, Jamestown, and Torrance Streets.

Milford Fuller ("Fuller") testified that he rented the lower half of a two-family dwelling from Ulrich, who lived upstairs. R.1135-36. Fuller related that he was "very good" friends with Ulrich and liked him "a lot." R.1168. Fuller testified that he worked the 3:00 to 11:00 p.m. shift at the Quaker State gas station in Springville. He described the routine that he followed virtually every night: read the pumps, count the money, drop the money off at his supervisor's house, stop for something to eat, and go home. R.1142. Ulrich was familiar with Fuller's nightly routine *Id.*

On June 7, the night before the murder, Fuller arrived home between 11:45 p.m. and midnight, at which time he saw Ulrich drive his motorcycle onto the far end of the lawn, drive around behind a building, and come up between the barn and a trailer that was on the premises. R.1136-37. Fuller observed that Ulrich was wearing "close to a greenish color pair of coveralls" and was driving a red Honda motorcycle with silver fenders. R.1137-38. Fuller knew that the motorcycle was unregistered. R.1141.  Fuller and Ulrich conversed briefly; Ulrich mentioned that he had taken the motorcycle out for a drive. R.1151.

The following night, June 8th, Ulrich visited Fuller at the gas station at about 6:00 or 6:30 p.m., and again at 8:30 or 8:45 p.m. Both times, Ulrich drove his El Camino to the station, which was 2.3 miles from the duplex he shared with Fuller. R.1138-41. Fuller related that Ulrich usually drove his El Camino to the gas station when he would stop by to visit. R.1141.

Fisher testified that on the night of June 8th, she ate dinner with Smith and her son, Jeremy, between 5:00 and 6:00 p.m. R.1478-79. They had planned to go fishing afterwards, but Jeremy fell asleep on the living room floor while they were getting ready, so they decided to go the following morning. R.1480-81. At around 10:20 or 10:25 p.m., Fisher went to the store to buy beer and milk. R.1482. When she returned about ten or fifteen minutes later, she observed

Smith in the chair by the window, apparently asleep. R.1483. As she got closer, she realized that Smith was seriously injured, and she called for emergency help. R.1483-84.

Meanwhile, at about 10:15 p.m. on June 8th, George Hager ("Hager") and Arnold Samuelson ("Samuelson") were sitting on the front porch of Samuelson's house, which was next-door to Fisher's house at 150 Chestnut Street. R.1061. A motorcycle turned onto Chestnut Street from Jamestown Street and parked next to the curb about four houses away from Samuelson's. R.1061. The driver dismounted, removed his helmet, and walked toward the two men. R.1062. When he reached Hager's residence, which was two doors down from Samuelson's house, the driver walked down Hager's driveway. R.1061-62

Hager was unable to see precisely what the driver was wearing but could see that it was loose-fitting. R.1064. Hager described the driver as about 5'10" and 180 pounds. R.1069. Hager then walked over to his house and checked his driveway and backyard, but saw nothing. R.1063. At 10:25 p.m., as Hager left to pick up his grandson, he observed that the man's motorcycle was red with silver fenders. *Id.* Hager observed no other motorcycles on the street at that time.

Samuelson, who had been sitting with Hager, also saw the motorcycle drive by. After Hager left, Samuelson went inside his house. Shortly thereafter, he heard a loud explosion. R.1072. About a minute later, he turned on the front light and opened the screen door. *Id.* He saw a man about 5'9" or 5'10" and weighing about 190 pounds walking briskly by the house; the man slowed his pace when the light went on. According to Samuelson, the man was wearing a motorcycle helmet, some type of jacket, and baggy pants; it appeared to Samuelson that the man was "rather heavily dressed" for a "pretty warm night." R.1073. After the man went by, Samuelson heard the motorcycle start up and drive away down Chestnut Street. *Id.*

Meanwhile, at his apartment across the street from the Quaker State gas station, John Buetler ("Buetler") was sitting outside on his porch enjoying a few beers. T.338. Shortly before 11:00 p.m., Buetler went inside to get a beer. When he returned to the porch, a motorcycle[3] had parked in the parking lot next door. A man who appeared to have a mustache, in his late 20s or early 30s, threw some things on the ground, and walked across the street and into the gas station. R.1109-10. After a few minutes, he walked back to his motorcycle, picked something up off the ground, and drove away. *Id.* The motorcyclist did not drive in front of the gas station but went out through the large parking lot onto Route 39. R.1110. According to Buetler, the man appeared to be wearing a heavy winter jacket. *Id.*

Fuller, the Quaker State employee, testified that Ulrich appeared back at the gas station between 10:45 and 11:00 p.m. R.1139. This time, Fuller did not observe that Ulrich had a vehicle with him; he noted that this fact was unusual since Ulrich usually drove his El Camino. R.1141. Ulrich bought a candy bar and briefly conversed with Fuller about Ulrich's watch and the fact that it was running ten minutes off. R.1140. Fuller confirmed that no one else came into the gas station while Ulrich was there and no one else came in after he left. R.1141. Ulrich stayed for only a few minutes and left just before Fuller closed the station at 11:00 p.m. R.1140-41.

Shortly after 11:00 p.m. on the night of June 8th, Robert Botsford ("Botsford") was sitting in his backyard when he saw a fast-moving motorcycle turn off North Street into one of the driveways in the trailer park where Botsford lived. Botsford testified that the motorcycle moved rapidly through the trailer park, drove up onto the old railroad bed, and then the ignition was cut

---

[3] Under the mercury vapor light, the motorcycle appeared to Buetler to be greenish in color. R.1123. Later in the investigation, the police parked a red automobile in the same location and observed that it, too, appeared green under the mercury vapor light. R.1377.

off. R.1176. The motorcycle did not come back into view. Botsford remained outside until 2:00 or 2:30 a.m. *Id.*

Botsford's wife, Betty, also heard the motorcycle and caught a glimpse of it before it drove up onto the railroad bed. R.1185-86. She testified that it was a street motorcycle, not a dirt bike, and that the driver was wearing a helmet. R.1186-87. Mrs. Botsford testified that the railroad bed was so grown over that it looked like a "jungle" and that she had never seen a motorcycle on it. R.1176-77.[4]

Between 11:45 p.m. and midnight, Fuller arrived home, as per his usual custom. R.1142. Ulrich, freshly showered and shaved, was sitting on the porch of the duplex that he and Fuller shared. He engaged Fuller in a brief conversation before Fuller went inside his house. R.1142-44.

The next day, June 9th, Ulrich called his employee, Michael Masterson ("Masterson"), and asked him to continue cultivating the potato field. R.1410-11. He instructed Masterson to pick up where he had left off the previous day. R.1412. Masterson began at noon and worked for three hours, cultivating approximately thirty rows in an area which stretched from the rear of Ulrich's residence to the back of the potato field. R.1399.

When members of the Town of Gowanda Police Department arrived at the scene, they found Smith seated in the chair in the living room, bleeding profusely from the back of the head and probably already dead. It was apparent that he had been shot through the screen window as

---

[4] According to the police, their investigation revealed a trail from the railroad bed right-of-way onto Ulrich's potato field. R.1370. A small part of the right-of-way was kept mowed; other than that, it was not maintained, and contained such heavy brush and undergrowth that it was impassible even on foot. R.1370-75. The only place a motorcycle could go after driving through the trailer park and crossing the right-of-way was Ulrich's potato field; there were no other trails off of the right-of-way. R.1375.

he sat in the chair. Smith was rushed to the hospital by ambulance and pronounced dead on arrival. The scene was secured until State Police investigators arrived.

Investigator Terrance Roland of the State Police removed the window screen from the window directly adjacent to the chair in which Smith's body had been found. There was a hole in the screen indicating that the screen had been pushed in from the outside. Gowanda Officer Thomas Howard estimated that the window from which Investigator Roland removed the screen was three to four feet from where the victim's body was discovered[5] and that there was a hole in the screen giving the appearance that a shotgun had been fired through it. R.290-91.

When the police were shown where the red motorcycle had been parked, they observed an imprint the motorcycle tire had made. This area was secured until a plaster-of-paris moulage of the tire print could be made. R.1360-61. Laurence Murphy, a forensic scientist with the State Police, testified that the tread design of the moulage was consistent with tread of the tires on Ulrich's motorcycle. R.1459-60. In the area where Buetler had seen the motorcyclist park before going into the Quaker State station, the police recovered a pair of green coveralls but forensic testing did not link them conclusively to any individual.

On June 9th, the day after the murder, State Police Investigators Leonard Kwilos and Timothy Howard visited Ulrich's residence. They advised Ulrich of his *Miranda* rights, and he agreed to speak with them. R.1209-11. Ulrich's statements to the investigators were generally exculpatory. He admitted visiting the Quaker State gas station on June 8th, the night of the murder, but stated that he drove his El Camino there. R.1213-14. He said that he had driven his

---

[5] It appears that no exact measurement was ever made of the distance between the chair where the deceased was sitting and the window, most likely because this measurement did not become an issue until the parties began attempting to use shot pattern testing in order to identify or exclude the shotgun as the murder weapon. Photographs were taken of the crime scene, however, and were provided to the jury as exhibits.

motorcycle on June 7th, but denied riding it at all on June 8th. R.1212. He explained that he had recently used his .12-gauge shotgun to shoot pigeons on his farm because he had been having a problem with them. R.1214.

The .12-gauge shotgun owned by Ulrich was a "Victor Ejector" model made by the Crescent Firearms Company. R.1428. The officers found it in one of Ulrich's outbuildings and took possession of it with Ulrich's consent. R.1320. The weapon could be quickly broken down into three pieces. R.1238, 1429.  Ulrich also showed the police his Honda 750 motorcycle, which was red with silver fenders, and permitted the officers to photograph it. R.1236-37. Ulrich also allowed them to take a picture of him.[6] In addition, Ulrich surrendered a quantity of ammunition, including a Remington .12-gauge shotgun shell containing #6-shot. R.1321-22. During the interview with the police, Ulrich spoke of his love for Fisher, saying that "everything he did was for her." R.1239-40. Ulrich became teary-eyed and emotional when speaking of her. He stated that he had seen her on June 4th and had "begged" her to come back to him; that is when she told him that she was engaged to Smith.  *Id.*

Investigator Kwilos, who grew up on a farm, saw no evidence of pigeons on Ulrich's farm and did not observe any spent shotgun casings to indicate that a shotgun recently had been fired on the premises. R.1239. Investigator Forster, who also had familiarity with pigeons, saw no indication of a pigeon problem on Ulrich's farm. R.1367-68. Masterson, who had worked for Ulrich for several summers, never saw Ulrich shoot a shotgun on the farm, never personally observed any indication of a pigeon problem, and was never told of any such problem by Ulrich.

---

[6] The search warrant application described Ulrich as 5'11", with a medium build, weighing about 190 pounds, and having brown hair, blue eyes, and a mustache. Investigator Gerald Forster testified that, at the time of trial, Ulrich's appearance had changed in that he had shaved his mustache and lost some weight.

R.1396-97.  Becky Zittle, who worked for Ulrich in 1983, testified that she never saw any

pigeons on the farm and never saw Ulrich fire a shotgun around the premises. R.1504-05.

Pathologist Dr. José Galindo performed the autopsy and determined that Smith had been

killed by a shotgun blast to the back of his head. Dr. Galindo observed an "irregular hole in the

back of the head . . . measuring about three by two inches." R.1038.  The autopsy revealed the

following items embedded in Smith's head: a piece of plastic shotgun wadding known as a

"power piston" and 200 shotgun pellets and lead fragments. *Id.*

Investigator Boone, a firearms examiner with the State Police, determined that Smith had

been killed with a pre-World War II, smoothbore, .12-gauge Remington shotgun cartridge loaded

with #6-shot pellets. R.1433-34. As discussed above, Boone initially tested the weapon on June

26, 1984.[7] He was unable to give an opinion as to whether the shotgun was in fact the murder

weapon; in order to place a particular shotgun a the crime scene, he would have needed the

expended cartridge casing. However, no spent casings or spent shells were recovered at the

crime scene; the perpetrator either picked up any shell fragments or never ejected the shell in the

first place. Investigator Boone summarized the results of his shot pattern testing performed on

January 28, 1986:  he obtained a hole measuring approximately 1 1/4" by 1 1/4" at four feet; 1

1/2" by 1 1/2" at five feet, and 1 3/4" by 1 3/4" at six feet. Investigator Boone did not fire his

shots through a window screen. Defense counsel questioned Boone about the fact that at four

feet all of the shot pellets fired from the shell were contained within the shot pattern but did not

question him about the results of his tests at either five or six feet.

---

[7] Boone's June 26, 1984 report indicated that "[d]ue to the lack of gunpowder or residue on the evidence, number 7, window screen, no determination of muzzle-to-target distance could be made; however, the hole in the screen exhibits a stellate or star-shaped pattern which is indicative of a contact or near contact blast."

The jury returned a verdict convicting Ulrich as charged in the indictment. Ulrich was sentenced to an indeterminate term of fifteen years to life in prison.

## Direct Appeal

Represented by new counsel on direct appeal, Ulrich argued (1) that the evidence against him was legally insufficient; (2) that the prosecutor improperly was permitted to introduce testimony that (a) petitioner possessed a .12-gauge shotgun and one Remington #6-shot shell (although the gun and shell were not introduced into evidence), (b) petitioner allegedly acted strangely toward Fisher the day before trial;[8] (c) Fisher's tires were slashed after petitioner had called her and questioned her about her tires, and (d) the tire impression in the vicinity of the homicide was made by the motorcycle driven by the murderer; and (3) the jury instruction on circumstantial evidence was erroneous. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed Ulrich's conviction. *People v. Ulrich*, 152 A.D.2d 993 (App. Div. 4th Dept. 1989). The Court of Appeals denied leave to appeal, *People v. Ulrich*, 74 N.Y.2d 952 (N.Y. 1989), and denied petitioner's motion for reconsideration, *People v. Ulrich*, 75 N.Y.2d 818 (N.Y. 1990).

## First C.P.L. § 440.10 Motion

On August 3, 1995, Ulrich collaterally attacked his conviction by means of a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, alleging that the prosecutor had violated its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over certain allegedly exculpatory material to defense

---

[8] Fisher testified that she was sitting near the window at a coffee shop in Springville and Ulrich drove by and saw her. According to Fisher, Ulrich "kept riding by" and appeared to be "trying to survey" her. R.1488. Defense counsel did not object to any of this testimony.

counsel–namely, Investigator Boone's notes regarding his shot pattern testing on January 28, 1986, of the shotgun found at Ulrich's farm.[9] *See* R.164 (Boone's notes). Ulrich argued that "had the undisclosed shot pattern report been given to the defense,[10] the shot pattern report would have indicated that the .12 gauge shotgun was not consistant [*sic*] with that of having been a 'three to four feet muzzle to target distances [*sic*] shot that killed Mr. Smith[.]" Defendant's Affidavit in Support of First C.P.L. § 440.10 Motion at pg. 9 (Respondent's Answer, Exhibit B). Ulrich stated that he had hired his own firearms expert, Richard J. Janelli, who reportedly had obtained a shot pattern from the shotgun found at Ulrich's residence that was inconsistent with the diameter of the wound pattern in the victim's head. *Id.*; *see also* June 30, 1993 Report submitted by Richard Janelli as an exhibit to the First C.P.L. § 440.10 Motion, R.411-14  ("I am unable to reproduce a hole to the measurements given by the Medical Examiner without a hole being caused by the [.12-gauge plastic] wad with the use of this shotgun.").

The County Court (Nenno, J.) denied the motion, holding that Ulrich had failed to show a "reasonable possibility that such information [*i.e.*, Boone's notes] available at the time of trial would have brought about a different result." January 29, 1997 County Court Order Denying

---

[9] In his sur-reply, the prosecutor explained Sergeant Boone tested the shotgun and issued his initial report dated June 26, 1984, which the defense acknowledged receiving on August 31, 1984. In the "Remarks" section, Sergeant Boone noted that "[d]ue to a lack of gunpowder residue on the evidence #7 window screen, no determination of muzzle-to-target distance can be made; however, the hole in the screen exhibits a stellate or star-shaped pattern which is indicative of a contact or near contact blast." People's Affidavit, ¶¶ 6-7. The prosecutor noted that prior to trial, the defense did not seek to have the weapon tested by an expert. *Id.* About five days after trial had commenced, and before calling Investigator Boone to testify, the district attorney requested that Investigator Boone re-test the weapon. On January 28, 1986, Investigator Boone did so, and the results confirmed those in his original report; consequently, he did not issue a new report.

[10] Ulrich contended that his C.P.L. § 440.10 motion followed "a well-documented ongoing six-year attempt to obtain the notes in question." The prosecution has queried several times in its motion papers how Ulrich "managed to spend six years seeking something that he claims to have been unaware of." People's Reply Brief to Second C.P.L. § 440.10 Motion at 3 (Respondent's Exhibit C).

First C.P.L. § 440.10 Motion at 2 (citing *People v. Vilardi*, 76 N.Y.2d 67, 555 N.E.2d 915, 556 N.Y.S.2d 518 (N.Y. 1990) (Respondent's Answer, Exhibit B). Initially, Judge Nenno denied an evidentiary hearing. However, he later changed his mind and appointed Donald Thompson, Esq. to represent Ulrich and ordered an evidentiary hearing pursuant to C.P.L. § 440.30.

Now represented by attorney Thompson, Ulrich filed a re-worked C.P.L. § 440.10 motion, alleging the same "*Brady/Rosario*"[11] claim with respect to the one page of notes made by Boone during his January 28, 1986 re-test of the shotgun that. The County Court (DiTullio, J.) presided over the evidentiary hearing, which was held on August 11, 1997; October 10, 1997; and December 12, 1997.

Defense counsel Joel Daniels ("Daniels") testified that if he had been provided with Boone's notes prior to trial, it "may have helped . . . considerably towards obtaining a more favorable verdict" because Boone's notes "show that the shot pattern testing may be inconsistent with the width of the wound that was demonstrated on the back of [the victim's] head." H1.16.[12] Daniels testified that if he had the notes, he "may have" questioned Boone about the shot pattern distance at six feet because that "would also have showed a narrow shot pattern and that would have been helpful to the defense," since the "shot pattern was narrower than the wound on the back of the victim's head." H1.17.

On the issue of whether he had received the notes, attorney Daniels stated on cross-

---

[11] Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution is obligated to disclose all evidence favorable to the accused, either because it is exculpatory, or because it is impeaching. *People v. Rosario*, 9 N.Y.2d 286, 290 (1961), expanded the requirements defined in *Brady* and its progeny, holding that the prosecution must disclose any prior statement of its witness, regardless of whether it is favorable to the accused.

[12] Citations to "H1.__" refer to the transcript of the August 11th hearing; citations to "H2.__" refer to the October 10th hearing; and citations to "H3.__" refer to the December 12th hearing.

examination that he had "no present recollection of receiving" them but that it was "possible that [the prosecutor] may have" given him a copy. H1.22. Attorney Daniels conceded that when he was cross-examining Boone, he asked Boone about the barrel size, which was one of the items mentioned on the notes, and Boone indicated that he had obtained a measurement of .690 inch.[13] H1.23. Boone also said, "Yes, I have that here." Attorney Daniels conceded that Boone "may have" been referring to notes that he had with him. *Id.* In addition, Daniels admitted that "the shot pattern [at] four and five and six feet . . . was made out on direct examination[.]" H1.24. When asked which items in Boone's notes were *not* brought out during Boone's testimony, attorney Daniels stated that he did not "recall specifically." H1.25. He conceded that after hearing Boone's testimony, he did not ask for a continuance. *Id.*

The prosecutor who handled Ulrich's case, Larry Himelein ("Himelein"), had become a County Court Judge at the time of the C.P.L. § 440.10 hearing. He testified that he asked Boone to do some additional testing on the shotgun to "[t]ie it enough so that Judge Kelly would . . . admit it into evidence[.]" H2.47. He did not recall asking for any specific tests to be performed, and did not know the particulars of the tests Boone performed (*i.e.*, whether he fired the gun through a window screen). Himelein testified that Boone did not send him a copy of the report of the re-test since it was in the "days before fax machines;" rather, he brought the original with him to trial. H1.32. Himelein's "recollection [wa]s that he brought his original with him and that Mr. Daniels not only saw it, but had it in his hands at one point as he was . . . questioning Mr.

---

[13] As the prosecution pointed out in its response to Ulrich's second C.P.L. § 440.10 motion, only Boone's notes mentioned the muzzle diameter measurement of .690 inch, which strongly implies that attorney Daniels had the notes while he was cross-examining Boone.

Boone." H1.32-33; 34.[14] Investigator Boone could not recall whether he provided the notes to the prosecutor or whether trial counsel had the testing notes during his cross-examination. H3.40. In response to one of defense counsel's questions, Investigator Boone stated, "Yes, I have that here," and he assumed that by "it" he was referring to his notes. H3.81.

Petitioner's firearms expert, Richard Janelli, testified that the hole in the window screen at the victim's residence was not made by a shotgun, although it is conceded that the victim's fatal wound was caused by a shotgun.[15]  Investigator Boone testified that he did not give an opinion at trial as to whether Ulrich's shotgun was the murder weapon; he explained that there was no way to determine what weapon was used to murder Smith because there were no expended cartridge casings or shells found at the scene. H3.37. Investigator Boone testified that his purpose, during the re-test, was to determine at what distance the shotgun pattern started to present a pellet spread. H3.43. Investigator Boone testified that he did *not* fire the shotgun through a window screen during any of this test shots. H3.55.

Dr. Fazlollah Loghmanee, the Associate Chief Medical Examiner for Erie County, testified as a rebuttal witness for the prosecution. Dr. Loghmanee testified as to the "billiard ball effect ricochet" which occurs when shotgun pellets hit the back of a human skull, which is spherical and covered with skin; the pellets in front are stopped by the skull or skin, and the ones traveling behind hit the ones stopped in front and disperse. H3.86. This causes a hole that is

---

[14] Apparently, the original report was never located. Respondent has suggested that this is because Daniels–intentionally or inadvertently–never returned the original to the prosecutor and put it in his file, which later was provided to Ulrich in connection with preparing his direct appeal.

[15] As noted *supra* in this opinion, 200 #6-shot shotgun pellets and plastic shotgun wadding were recovered from the wound in the victim's head. Janelli's testimony is discussed in further detail *infra* in the context of Ulrich's claim of ineffective assistance of trial counsel.

larger than what one would expect if one were to shoot the shotgun through a different medium. *Id.* Dr. Loghmanee testified that the irregularity of the wound's shape suggested that there was a reentry, meaning that the pellets went through an obstacle before hitting the victim's skull. H3.98.

In a written decision dated May 3, 1998, Judge DiTullio reversed Ulrich's conviction, finding as a matter of fact that the prosecution had not turned over Boone's notes to the defense. R.14-17. Judge DiTullio commented that Janelli's hearing testimony was "'indeed significant because it tend[ed] to establish that the defendant's shotgun, a lynchpin in the People's circumstantial case, was *not* the murder weapon.'"  R.17-18 (emphasis in original).

On October 1, 1999, The Appellate Division, Fourth Department, of New York State Supreme Court, reversed Judge DiTullio on the law and the facts, holding that while Judge DiTullio's determination was "entitled to great weight," her "finding that the People failed to provide defense counsel with a copy of the notes of a witness who testified at trial [was] against the weight of the evidence." *People v. Ulrich*, 265 A.D.2d 884 (App. Div. 4th Dept. 1999) (internal citations omitted). The Appellate Division went on to hold that, even if defense counsel had *not* been provided with the notes, the evidence was "insufficient to support the determination to vacate the judgment of conviction." *Id.* at 885. Pursuant to C.P.L. § 440.10(1)(f), a hearing court is authorized to vacate a judgment of conviction upon proof that "[i]mproper and prejudicial conduct not appearing in the record occurred" during the trial, "which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom[.]" *Id.* (quoting N.Y. Crim. Proc. Law § 440.10(1)(f)). The Appellate Division noted that a defendant bears a more stringent burden on collateral review and, in order to justify a

reversal based on a *Rosario* violation, must demonstrate "prejudice–meaning a reasonable

possibility that the prosecution's failure to make *Rosario* disclosure materially contributed to the

verdict[.]" *Id.* (quotation omitted). The Appellate Division held that

> the evidence at the hearing [was] legally insufficient to support the court's
> conclusion that the alleged failure to furnish the one-page notes of the firearms
> examiner deprived defendant of effective cross-examination and the opportunity
> to engage his own firearms examiner. With the exception of a single parenthetical
> phrase, the notes were identical to the trial testimony of the firearms examiner
> concerning the shot pattern tests that he performed on defendant's shotgun after
> trial had commenced.[16] Both the testimony and the notes reflected that the testing
> resulted in shot patterns that were smaller in circumference than the wound in the
> victim's skull, thus suggesting that defendant's shotgun was not the murder
> weapon. The parenthetical notation "pellets starting to spread" after the result of
> the six-foot shot pattern test provides no material information beyond that
> provided by the witness's testimony. Therefore, it cannot reasonably be
> concluded that the failure to disclose the notes affected the cross-examination of
> that witness by defendant's trial counsel or his decision not to retain his own
> firearms expert. Thus, notwithstanding the court's determination that the notes
> were not furnished, the motion should have been denied based on defendant's
> failure to establish a reasonable possibility that the alleged *Rosario* violation
> materially contributed to the verdict.

*Id.*

### Second C.P.L. § 440.10 Motion

Now represented by his current attorney, Howard K. Broder ("Broder"), Ulrich filed a

second motion pursuant to C.P.L. § 440.10, alleging that trial counsel Daniels was ineffective in

failing to "take measures to adduce affirmative proof that the recovered shotgun was not the

murder weapon once counsel was provided with [Boone's] notes and other evidence suggesting

that the shotgun was not the murder weapon." Petitioner's Brief on Appeal of Denial of Second

C.P.L. § 440.10 Motion at 31 (Respondent's Exhibit C). Although on his first C.P.L. § 440.10

---

[16] Investigator Boone's notes consisted of one-half of a handwritten page and read as follows: "shot pattern testing @ Academy #6 shotgun and lab stock ammo (Rem. #6): 4' = 1 1/4" circular hole 5' = 1 1/2" [circular hole] 6' = 1 3/4" [circular hole] (pellets starting to spread) #6 shotgun - 30" bbl. - muzzle diam. - .690" - full choke." R.164.

motion Ulrich claimed that trial counsel had not been furnished with Boone's notes, he changed

tack following the Appellate Division's order reversing Judge DiTullio's findings, and argued on

the second C.P.L. § 440.10 motion that Daniels did have the notes all along, and that he should

have sought further testing of the shotgun based on them.

On October 19, 2000, the County Court (Martoche, J.) denied the motion on procedural

grounds, noting that the claim of ineffective assistance of counsel could have been raised on

direct appeal but unjustifiably was not. *See* N.Y. Crim. Proc. Law § 440.10(2)(c), (3)(c). The

Appellate Division (Hurlbutt, J.) granted leave to appeal on March 22, 2001, but then summarily

affirmed Judge Martoche's decision based on the reasons set forth in the order appealed from.

**The Habeas Petition**

This timely habeas petition followed in which Ulrich raises the following grounds for

relief: (1) the prosecution violated its *Brady* obligations by failing to disclose Investigator

Boone's notes; (2) trial counsel was ineffective in failing to retain a firearms expert to

affirmatively disprove that Ulrich's .12-gauge shotgun could have been the murder weapon; and

(3) appellate counsel was ineffective in failing to argue that trial counsel rendered

constitutionally inadequate assistance. For the reasons set forth below, the petition is denied.

### DISCUSSION

**Standard of Review and Procedural Default**

The filing of Ulrich's petition post-dates the enactment the Anti-terrorism and Effective

Death Penalty Act ("AEDPA")[17] on April 24, 1996, which mandates that the federal courts give

considerably more deference to the state courts' adjudications of habeas petitioners'

---

[17] Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1219.

constitutional claims. AEDPA's revisions of the federal habeas statute, codified at 28 U.S.C. §

2254, govern the disposition of Ulrich's petition. Pursuant to AEDPA, a petitioner seeking

federal review of his conviction must demonstrate that the state court's adjudication on the

merits of his federal constitutional claim resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Supreme Court precedent, or resulted in a

decision that was based on an unreasonable factual determination in light of the evidence

presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-

76 (2000).

     Respondent has raised the defense of procedural default with respect to Ulrich's

ineffective assistance of trial counsel claim and *Brady* claim, but concedes that with respect to

the ineffective assistance claim, this is a situation "in which the merits of petitioner's claims

ought to be addressed first." Respondent's Memorandum of Law at 16 (Docket #8) (citing

*Dunham v. Travis*, 313 F.3d 724, 729-30 (2d Cir. 2002) (holding that hurdling the procedural

default issue to reach the merits of a habeas petition is justified where the underlying issue is

easily resolvable against the petitioner while the procedural bar issue involves complicated

issues of state law)). Respondent then goes on to argue the substance of Ulrich's ineffective

assistance of trial counsel claim. Similarly, with respect to the *Brady* claim, respondent also

argues that the claim substantively is without merit.

     Because it is more efficient to resolve Ulrich's claims on the merits, and because

respondent has addressed the merits of the claims in his pleadings, the Court, in the interest of

fairness and judicial economy, will address both of these claims on the merits. *See Dunham*, 313

F.3d at 729-30.

Respondent has not raised the defenses of procedural default or non-exhaustion with respect to the ineffective assistance of appellate counsel claim. Indeed, this claim appears to be fully exhausted and properly before this Court.

## Merits of the Petition

### 1.   *Brady* Claim

"To the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citing *Kyles v. Whitley*, 514 U.S. 419, 431 (1995); *Brady v. Maryland*, 373 U.S. at 87 (holding suppression by the prosecution of evidence favorable to the accused " violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution")). Information coming within the scope of this principle includes not only evidence that is exculpatory (*i.e.*, going "to the heart of the defendant's guilt or innocence"), but also evidence that is useful for impeachment because it has "the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.") (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). As the Supreme Court has explained, there are three components to a true *Brady* violation: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The Appellate Division found, as a fact, that the defense was provided with the notes made by Boone, the firearms examiner, during his re-test of the shotgun. *See People v. Ulrich*, 265 A.D.2d at 884, *supra*. Pursuant to AEDPA, federal habeas courts are required to give special deference to state courts' factual findings, and must presume them to be correct unless the petitioner adduces "clear and convincing evidence" to rebut that presumption. 28 U.S.C. § 2254(e)(1). In finding that the prosecution had not "suppressed" Boone's notes, the Appellate Division stated,

> At the CPL 440.10 hearing, defendant's trial counsel testified only that he had no recollection of receiving a copy of the witness's notes, which consisted of a single page. He further stated that "the reason I don't believe I got a copy is that when I looked through my file specifically looking for the notes, I could not find them." On the other hand, the trial prosecutor testified to his specific recollection that defendant's trial counsel had been furnished with the notes and had used them in cross-examining the witness at issue, a State Police firearms examiner. Most significantly, the trial record reflects that, in response to a question on cross-examination, the firearms examiner responded: "Yes. I have that here", and then furnished the diameter of defendant's shotgun muzzle, a measurement found in no other document save the notes at issue. Despite a consistent pattern of inquiring of the trial witnesses whether they had any notes or memoranda concerning their testimony, defendant's trial counsel did not so inquire of the firearms examiner, thus supporting the inference that he had already been furnished with the notes of that witness. We conclude, therefore, that defendant failed to meet his burden of establishing by a preponderance of the evidence that defense counsel was not furnished with the notes of the firearms examiner

*Id.* at 884-85 (citation omitted). Ulrich has offered nothing to rebut the presumption of correctness that must be accorded to the state court's factual findings detailed above. Indeed, the Appellate Division's finding is fairly supported by the record of the C.P.L. § 440.10 hearing and trial.

Moreover, as the Appellate Division found, all of the essential information in Boone's notes was disclosed to the jury either during his direct examination or cross-examination:

With the exception of a single parenthetical phrase, the notes were identical to the trial testimony of the firearms examiner concerning the shot pattern tests that he performed on defendant's shotgun after trial had commenced. Both the testimony and the notes reflected that the testing resulted in shot patterns that were smaller in circumference than the wound in the victim's skull, thus suggesting that defendant's shotgun was not the murder weapon. The parenthetical notation "pellets starting to spread" after the result of the six-foot shot pattern test provides no material information beyond that provided by the witness's testimony. Therefore, it cannot reasonably be concluded that the failure to disclose the notes affected the cross-examination of that witness by defendant's trial counsel or his decision not to retain his own firearms expert. Thus, notwithstanding the court's determination that the notes were not furnished, the motion should have been denied based on defendant's failure to establish a reasonable possibility that the alleged *Rosario* violation materially contributed to the verdict.

*Id.* (emphasis supplied). "'Evidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982), *cert. denied*, 459 U.S. 1174 (1983) (citations omitted in original)); *accord, e.g.*, *Davis v. United States*, Nos. 98-CV-0541E(F), 92-CR-157E, 1999 WL 1067575, at *10 (W.D.N.Y. Nov. 17, 1999) (rejecting *Brady* claim based on the government's failure to disclose items relating to the plea agreement made with the petitioner's co-defendant because the information was not "suppressed" since "during the examination of the co-defendant at trial, the petitioner's attorney elicited a response that clearly indicated a plea agreement had been entered into with the prosecution"). As the Appellate Division found, trial counsel had all of the "essential facts" necessary for him to take advantage of this allegedly exculpatory material as it came out both on direct and cross-examination of Investigator Boone.

Moreover, even if there was a failure to disclose, which this Court does not find to be the case, Ulrich was not prejudiced because the jury had before it testimony to the effect that the size of the entry hole in the back of the victim's head was larger than any of the holes that resulted

when Investigator Boone test-fired the shotgun. (The autopsy showed that the fatal wound in the victim's skull was an irregularly shaped hole about 3" by 2" while the shot patterns fired by Investigator Boone at distances of four, five and six feet produced circular holes with diameters of approximately 1-1/4", 1-1/2", and 1-3/4", respectively.) Thus, the factual basis for the inferences that Ulrich wished the jury to draw–that the shotgun found on his property could not cause the size hole found in the victim's head or the screen and therefore was not the murder weapons–was already present on the record. Indeed, this is what trial counsel argued during summation. For the foregoing reasons, the Court cannot find that there was "suppression" of the notes and therefore Ulrich is unable to make out a viable *Brady* claim. *See Strickler v. Greene*, *supra*.

## 2.      Ineffective Assistance of Trial Counsel

### a.      Legal standard

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.  The issue of prejudice need not be addressed, however, if a petitioner is

unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

  **b.**   **Basis for Finding Ineffectiveness**

  Ulrich contends that trial counsel was ineffective in failing to conduct independent testing of the shotgun recovered on Ulrich's property to demonstrate affirmatively that it was not the murder weapon. At the C.P.L. § 440.10 hearing before Judge DiTullio on the *Brady/Rosario* issue, trial counsel Daniels testified that he did not see the need for independent testing because his strategy had been to argue that the shotgun should not be admitted because the prosecution could not demonstrate that it was connected to the murder.

  No one seriously disputes that ballistics testing at the microscopic level was not possible on Ulrich's very old, smoothbore shotgun. Rather, Ulrich contends that trial counsel should have found an expert that would have ruled out the shotgun as the murder weapon based on shot-pattern testing–that is, testing to show the differences between the diameter of the wound to the victim's head and of the hole in the window screen as compared to the diameters of the holes made when the gun was test-fired. Ulrich points to the results of Investigator Boone's shot-pattern testing which, for the purpose of his ineffective assistance claim, he contends that trial counsel *did* have available to him, and asserts that these notes definitely should have prompted trial counsel to request a continuance of the trial after Investigator Boone's testimony and to arrange for further testing of the shotgun. Because, in connection with his post-conviction collateral attacks, Ulrich did retain a firearms expert (*i.e.*, Janelli) to perform additional testing on the shotgun, the Court is in the position to evaluate whether Ulrich was prejudiced by trial

counsel's failure to retain this expert during trial.

The part of Janelli's opinion testimony of most interest to Ulrich is Janelli's conclusion that the hole in the window screen at the victim's residence was not "consistent with that of having been made by" Ulrich's, or any other, shotgun. H2.46-47, 58-59, 69. He based this conclusion on the fact that he was unable to produce a hole of the same diameter with no separate pellet holes at distances of less than eight feet with Ulrich's shotgun. H2.44-48. He also said that he was unable to reproduce a shot pattern of 3" by 2" (the size of the victim's wound), with the plastic wadding still contained in the shot pattern. It should be noted that Janelli used a Homasote® board for his target because he found that it "best" simulated a human skull. H2.51, 56.

As an initial matter, the Court finds is significant that Janelli admitted on direct examination a shotgun's "shot patterns will vary from round to round." H2.53. He also conceded that his test results were similar to Investigator Boone's at distances of four and five feet. H2.61. Janelli also admitted that, looking at Investigator Boone's test results, he would not be able to tell what type of shotgun created those shot patterns. H2.63.

Janelli's testing methods were problematic in that he did not take into account a number of variables. First, Janelli did not verify that the window screen through which he fired his test shots was of the same type and tension, or was supported in the same way as the one that was on the victim's house; furthermore, Janelli's screen was brand new, while the one in question was relatively old. Janelli fired his shotgun perpendicularly to the screen; there is no way of knowing whether the murderer fired in the same manner. Janelli stated that he "wish[ed]" he had seen the window screen through which the fatal shot was fired. H2.70. Janelli conceded that shot patterns

can be affected by the condition of the pellets in each of the shotgun shells. Janelli believed that in factory-loaded #6-shot there are 225 pellets; however, it is possible that the murderer loaded his own shells with fewer pellets. In fact, only 200 pellets were extracted from the victim's head, and no other pellets or slugs were found at the murder scene. Janelli also conceded that the gun's cylinder bore could affect the shot pattern. He did not measure the inside diameter of the bore and assumed it to be .729; Investigator Boone did measure the bore and determined that it actually was .690. For several test rounds, Janelli fired multiple shots through the same screen; the killer only fired one shot through the screen. These are some of the variables in Janelli's methodology which could account for his reported inability to reproduce the same size hole in the screen.

Moreover, Janelli contended that there was *no* difference between the Homasote® board into which he fired his test shots and a human skull. H2.71. He was unfamiliar with the phenomenon known as the "billiard ball effect ricochet," H2.72, to which Dr. Loghmanee testified at the C.P.L. § 440.10 hearing. The billiard ball effect occurs with shotgun pellets rather than with slugs. Upon hitting the skull, the first pellets are stopped and then struck by the pellets coming from behind. The result is dispersal of the pellets which in turn creates a larger hole than if one were to fire the shotgun through a medium such as a screen or a board. The billiard ball effect also causes irregularly shaped wounds. According to Dr. Loghmanee, because the tension of the skin over the skull is tighter than it is in other areas of the body, there will be a larger hole than one would expect from the size of the projectile, and the pellets will spread over a larger area. Also, Dr. Loghmanee explained, an intermediate obstacle (such as a window screen) could cause the shotgun pellets to cause a large hole in the final target surface.

As discussed above, Janelli's methodology had a number of flaws, and he failed to account for certain important variables–this consequently weakened the strength of his conclusions. Moreover, his opinion that the hole in the window screen was not "consistent with" being caused by a shotgun was rather incredible; that would imply that the killer made a hole in the window screen and *then* fired the shotgun through it, or that there was a pre-existing hole through which the killer placed the muzzle of the gun. Neither of these assertions is supported by logic or the physical evidence. Rather, the undisputed proof was that shotgun pellets and a plastic shotgun wadding were found in the victim's head. Finally, Janelli was unaware of the "billiard ball effect ricochet," which the jury easily could have found accounted for the discrepancy between the size of the holes in his test-firings and the size of the hole in the victim's skull.

It must be remembered that throughout the state court proceedings, both sides have not disputed that the type of ballistics testing that can be done with pistols and revolvers is not possible to do with shotguns because shotgun barrels do not have "rifling" marks. These rifling marks, *i.e.*, grooves (spaces that are cut out) and lands (the resulting ridges), are imprinted into the bearing surface of the projectile and leave microscopic toolmarks which can be utilized to identify a projectile to a specific revolver.  Most shotguns–and the shotgun at issue here–are smooth-bored weapons, making shotgun ammunition nearly impossible to identify to a specific weapon.

Indeed, attorney Daniels was aware of this fact and testified at the C.P.L. § 440.10 hearing that was why he initially did not have the shotgun tested–because a microscopic rifling comparison would not be possible. Moreover, there were no expended shotshells or other

fragments left behind at the crime scene that could be utilized for comparison. As discussed above, the only type of testing that was possible in this situation, shot pattern testing, would have involved too many variables for a firearms examiner to replicate the fatal shot exactly. Indeed, the results of petitioner's own expert testing were greatly weakened due to his failure to account for these variables. To this Court's mind, it appears that it would not be possible for anyone, regardless of how thorough his methods, to adequately account for all of the variables involved in shot pattern testing. The Court thus has grave doubts that *any* firearms expert would have been able to "affirmatively" prove that the shotgun found in Ulrich's outbuilding was not the murder weapon. For all of the foregoing reasons, the Court cannot find that there was any "reasonable probability" that Ulrich was prejudiced by defense counsel's failure to have the shotgun tested further.

In addition, the Court finds that defense counsel had a calculated and reasonable strategy regarding the shotgun, which was to move to preclude the prosecution from introducing the shotgun into evidence. The Court notes that he was successful at keeping the actual gun and shotgun shells out of evidence. Trial counsel presented a strong defense; he vigorously cross-examined the prosecution's witnesses and sought to show that there were a number of other individuals who bore grudges against the victims and thus had plausible motives for murder. On summation, trial counsel cogently argued that issue of the shotgun and highlighted the prosecution's failure to present any proof to link it to the murder:

> Now, the gun was taken, there is no question about it but let's talk about that second step that you draw whether or not that, in fact, was the gun that was used to kill Jack Smith. The first thing they did with that gun [is] they tested [it]. The State Police lab fellows took it and they went through that gun with a fine-tooth comb. They got experts over there in Albany, believe me, they've got machines and tests. Now, you all got common sense. You think if there was one thing on

> that gun that connected it to this killing[,] why you would have heard it – they
> would have had a brass band come in here and play it for you . . . he took one of
> those 80 power microscopes with a big light on it and he went through it and he
> looked for it and he couldn't find any aluminum on it at all. They couldn't find
> any residue of gun powder. They couldn't find anything to connect that weapon
> with the shooting of Jack Smith.

R.1583-84. Trial counsel also alluded to the disparity between the size of the shot patterns and

the size of the wound in the victim's head: "[Boone] told . . . us, that regardless of the type of

barrel that would e used[,] because the distances were so small, 4, 5 and 6 feet, the chances are

that you're going to get a tight pattern regardless, so any type of barrel could have caused that

pattern in the back of Smith's head." R.1586.

Ulrich cannot show that trial counsel rendered professionally unreasonable

representation, let alone that he was prejudiced by trial counsel's failure to retain a firearms

expert to perform shot pattern testing. Therefore, he is unable to show that trial counsel failed to

provide effective representation, as guaranteed by the Sixth Amendment. Accordingly, this claim

provides no basis for habeas relief.

**3.      Ineffective assistance of appellate counsel**

The two-pronged standard set forth in *Strickland*, 466 U.S. 668, *supra*, applies equally to

claims of ineffective assistance of appellate counsel. *E.g.*, *Claudio v. Scully*, 982 F.2d 798, 803

(2d Cir. 1992) (holding that in order to prevail on an ineffective assistance of appellate counsel

claim, appellant must show first that his counsel's performance was deficient and second that the

deficiency caused actual prejudice to his defense), *cert. denied*, 508 U.S. 912 (1993). In

attempting to establish that appellate counsel's failure to raise a claim on appeal constitutes

deficient performance, it is insufficient for the petitioner to show "merely that counsel omitted a

nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous

argument that could be made." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983)). Whether

the neglected appellate issue is based on federal or state law, the burden rests on petitioner to

show "that counsel omitted significant and obvious issues while pursuing issues that were clearly

and significantly weaker." *Id.*  In assessing appellate counsel's performance, the Court must

judge the conduct at issue on the basis of the facts of the particular case, viewed as of the time

that counsel was preparing the appeal. *Strickland*, 466 U.S. at 690.

As discussed above, Ulrich did not have a meritorious claim that trial counsel was

constitutionally ineffective. Given that this argument, which Ulrich identifies as erroneously

omitted on appeal, is without merit, he is unable to prove prejudice since omission of

insignificant claims that will likely be unsuccessful does not prejudice a defendant. *See Mayo v.

Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) ("To establish prejudice in the appellate context, a

petitioner must demonstrate that 'there was a "reasonable probability" that [his] claim would

have been successful . . . .'" (alteration in original) (quoting *Claudio v. Scully*, 982 F.2d at 803);

*see also Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[T]he failure to raise

nonmeritorious issues does not constitute ineffective assistance."). Because Ulrich cannot prove

prejudice, it is unnecessary to address whether appellate counsel's performance was deficient.

*Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance

claim to . . . address both components of the inquiry if the defendant makes an insufficient

showing on one."). Accordingly, this claim does not warrant federal habeas relief.

## CONCLUSION

For the reasons stated above, petitioner Joseph Ulrich's petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner

has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a

certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:        August 10, 2006
              Buffalo, New York.